Commission? Council, you may proceed. Thank you, your Honor. May I please report? Mr. Zuhr. Bob Mueller on behalf of Monterey Coal Company again. This is Mr. Donald Stewart who was awarded a wage differential by the arbitrator. The purpose of a wage differential is to compensate an injured claimant for reduced earning capacity. This means, of course, that he is not making as much now after the injury and treatment as he was before the injury. The case law suggests that he has to prove that but for the injury he would have been in full performance of his duties, in this case, of course, as a coal miner. Here, obviously, we have an occupational disease case which always is a little bit different than an injury case. So I guess we're talking about him not making as much money as he did before an occupational disease was diagnosed and treated if necessary. But that is not what happened in this case. He had one disease which was diagnosed before he ever became a coal miner and that's the asthma, of course. He worked with that disease under treatment for 30 years as a coal miner. Did not keep him, obviously, from working as a coal miner. And even if it became an occupational disease because it was in some way made worse by his exposures, whatever they might have been in the coal mine, it didn't keep him from working as a coal miner. He worked throughout. There is no evidence at all that he had to stop working as a coal miner because of any problems with his asthma, any breathing problems. No medical evidence of that. No medical evidence that it reached the point of no return, that he couldn't do it anymore even though he'd done it for 30 years. No evidence that he had any restrictions at all based on his asthma in those 30 years. In fact, in the last five to six months of his coal mine employment, he was restricted because of a back injury that he had and he had been working above ground. My understanding was in an office situation. At any rate, there was no evidence, no medical evidence here that he was precluded from any jobs because of his asthma. Well, wait a minute. The record, did either doctor, were the doctors asked to render an opinion as to his ability to work prior to the time he quit? Were they asked? Yeah. Not that I remember. The fact is he was. They both knew he was working with asthma. Paul was treating him for the asthma. And as I recall, he maybe did. Did Paul opine that he had CWP? Did he opine that? Yeah. He always does. Yeah, I'm sure. And if he had CWP as a matter of law, he could never go back to a coal mine, could he? I disagree with that, your honor. All the experts seem to say that once you have coal workers pneumocomiosis, you can never re-enter a mine. All it's going to do is aggravate it more. It's a risk. A risk? It's not a guarantee and that's what they usually testify to. I'm sure Dr. Paul testified to that in this case. It's a risk if you have pneumocomiosis. It's a risk that it could get worse if you go back to work in the coal mine. That is true. I agree with that. If it's permanent and coal dust aggravates it, doesn't it? It's a permanent condition? If they say it's a risk, your honor, I can't say. Is it a permanent condition? Well, yeah. So you can't be sure that it can CWP? Right. No, that's clear. And exposure to coal dust aggravates CWP, does it not? It can. That's my point. It's a risk of it getting worse. If it were guaranteed, they would say that and they don't. In this case, we have the opinion, but it's not just a general discussion. Both Billeter and Paul offered opinions that claim themselves would be endangered by continued exposure to the coal mining environment. Did they testify to that? They did. Okay. Well, what do you make of that? Okay. Number one, he had asthma for 30 years and worked as a coal miner. They both come in, not mainly, Paul treated him. Billeter said he pinch hit for him. And they both knew he was working with the asthma. Yet, when he's finished working, they come in and testify basically he shouldn't have been. Well, that doesn't make any sense to me. That's number one argument. Well, Paul testified that he had CWP, it's a progressive disease, and he could not have further exposure to coal dust without endangering his health. Right. Now, if that's true, then he can't work as a coal miner anymore. And if the Commission accepts that as being true, which they evidently did, he cannot ever be a coal miner again. Could he? I mean, if they accept it as true, it is a fact. It's a progressive disease, incurable, and it's aggravated by coal dust. You've got a doctor that says he's going to endanger himself if he ever goes back to a coal mine. So now the question becomes, he can't work as a coal miner. What's he working at now? He's not doing anything. That's the point of my argument. A union officer. He didn't do anything. He quit as a coal miner in September of 2006, and he didn't do anything to look for work. He wasn't diagnosed with co-workers pneumoconiosis at that time. That came later. So that wasn't the reason he retired. He had been working with asthma for 30 years. That wasn't the reason he retired. He told Dr. Tudor it was because of his back injury and the fact that the mine was going to close, and he got medical benefits. And that's what the Commission says? No. That's what I say. That's what you say. He went to work as a union officer and also on some labor board or some type of a board. Made a total of $15,000 a year. And he said that in his opinion it was the best he could do. Isn't that what he said? I'm sure he did. He did? Yes. He had both those jobs, Your Honor, when he was a coal miner. Those are part-time jobs. Okay. He did not go look for any full-time work, any full-time gainful employment after he retired from Monterey Coal Company. He did not. And my position is that that is necessary for him to be able to get a wage differential. What about Gallinetti? I'm sorry? Gallinetti case? Does that say, when seeking a wage differential award, there was no affirmative requirement that a claimant even conduct a job search? Instead, he need only demonstrate an impairment of earnings. Evidence of a job search is only but one way to show impairment of earnings. That's what Gallinetti said. And did he? Right. Did he show an impairment of earnings? In my opinion, he did not, Your Honor. And that's what I'm saying. Well, you know what he was making as a coal miner. You know what he was making as this because he had those jobs before. He didn't go out and seek a job to take the place of the job, theoretically, he couldn't do anymore, which is the coal mine job. Okay. He didn't do that. He's got a full-time job and a part-time job. He's impaired from the full-time job. You just discount the part-time job at all? Is it based for a wage differential? Well, how did they prove, how did they prove? His testimony. His testimony. What he would make. He didn't go and look for that work. He didn't look for any work. They didn't have a vocational expert come in and say, oh, well, when he retired, he could have been earning this and only this. Does he need that in every case to recover? Well, how do you figure how much he could earn? There has to be something, I think. Usually, they say it has to be either he goes out and gets a job or he proves what he could with a vocational specialist saying, I've done the research, I've done the homework, I've interviewed him, I've looked at the labor market, here's what he could do, here's what he could earn. But that wasn't here. So you're saying it was a matter of a lot of claimants' testimony. Can that ever be sufficient to demonstrate or establish a wage impairment, a wage differential? You have to have a vocational expert in every case? He didn't say that he went out and looked for work. No, he should have. I would have to look at each case individually to answer that question. What he did testify to was his positions with the union and the board were the best work he could get outside of coal mining, considering his back and lungs. He said that's the best he could do. Now, he may have been impaired from working in a coal mine because of CWP, and to that extent, he loses that income, but the CWP didn't seem to bother his ability to work on the state mining board or as a local union president. So his diminishment is the loss of the coal mining salary as against what he's earning. He's presently earning. That's his diminished earning capacity. At least if they believe him, that's the best he could do. And they can't do that? There is no basis for him saying that. If there were a basis, they could. To me, it's just a self-serving statement. What you're saying is, what you think the cases demonstrate is a voc-expert program saying this is what this gentleman in this condition would be able to earn in an open market, or he has actually gone out and secured a job that shows what his highest and best use of society as an economic man is. Or, if he goes out and looks for work, Your Honor, and doesn't find anything for one reason or another, that's evidence. That's not what we have in this case, and that's what I'm saying. So you're saying a pre-existing part-time job would not satisfy that latter criteria? Because it's a full-time job he has with Monterey Coal Company, along with a couple part-time jobs. Well, basically what you're saying is that part-time job he has does not establish the market. In this case, it doesn't. Right. Exactly. That's what vocational or going out in a job search is to establish a market. Right. That's what I'm saying. And that was not done in this case. And that's traditionally the way it's done, but is this a matter of law you can't do it any other way? A matter of law? Well, if they believe him, in all cases you're saying you have to have the expert opinion, right? I didn't say you had to have an expert opinion. There has to be activity. There has to be something more than him coming in as a non-vocational expert and making a self-serving statement. Well, how self-serving was he? He was 57 years old. He's worked as a coal miner for 30 years and testified that all he ever did as an adult was something that had to do with coal mining. Now, we're dealing with a commission here, and we have to engage in the fiction that they have some specialized knowledge of these things. Now, we understand it's a fiction, but we still have to operate under it. Now, it would seem to me that they, in their expertise, can determine and say, well, look, you've got a guy that's 57 years old. He's been in it for 30 years. He's got CWP. He can't go back to the mine. And he's never worked in anything other than the mining industry. He's got these part-time jobs. We think that's enough to establish diminishment. And the only diminishment, really, is his loss of his coal mining money, whatever that is. And I'm not sure we're sure of that from this record, is how much that is. But the fact of the matter is, why isn't it enough for the commission to do it, especially in light of Gaglianetti? As I said, I just don't think it should be enough for some guy to come in and say, these two jobs that I had before, part-time jobs, are the best I could do. Well, your best argument is that this provision is to establish a market. And that this action, activity, that the commission bought into didn't establish a market. Because maybe a Walmart greeter makes $28,000 a year. I mean, it seems like he could do something out there. Because what you're saying, this particular fallback to part-time doesn't establish a market, and that's what this provision was for. Right. Now that you've made that compelling point, my opinion is, with regard to the actual wage differential that was awarded, is that it was complete speculation that he would have been earning that $1,056.40 per week as a coal miner in 2012. First of all, he retired and never applied for any work. At the time he retired, he did not have co-worker's pneumoconiosis diagnosed. He had been working with asthma for 30 years. He was not precluded, as far as I'm concerned, from a coal mine job. He never looked for a coal mine job or any other job. We don't know that there was any open coal mine that was working, subject to this agreement with this hourly wage that was put into evidence. We don't know that he would have been hired. We don't know that he would have had any chance of being hired. When do we determine when the hourly wage, for purposes of calculation, at the time of his injury or at the time of the arbitration for wage differential purposes? At the time of the arbitration. In my opinion, if the claimant knows that it changes, that should be proved to the arbitrator and the commission so that it shouldn't be based five years back on what it was in 2012. When you know what it could have been in the years before that. That doesn't make sense. What doesn't make sense is it's wage differential. It's from the date of the arbitration hearing. It is not from the date of injury. The date of the arbitration hearing fixes the amount that he could have earned if he were still working full-time profession to be then compared against the amount that he's capable of earning. It's certain. You are just absolutely wrong if you think it's the date of his injury. And there was evidence in this case that it was $26.41 was the hourly rate that was relied upon, and that's what he could have been earning at the time of the arbitration hearing in full performance of his duties. Now, the question is, how much is it to be multiplied by? You've got a reasonable argument that there's no 40-hour work week here, but that's really the only reasonable argument you've got on the amount of differential, certainly not the $26.41. If we decide it qualifies for differential. Right. And that's your whole argument. But if we know in 2011 that he would have made $25.41 or whatever it was, why don't we take that into consideration? Why should we? We've got to take into consideration what he could earn in the full performance of his duty at the time of the arbitration hearing. What does the X say? But my point is there are cases which indicate that if you, after arbitration, after the decision's final on a wage differential, if you can prove that the job you had been working and can't do anymore is getting bumps up, then perhaps you can get more in the wage differential, but you may be getting more in the job you're working. But you get the wage differential based on the amount you could have earned in that profession on the date of the arbitration hearing, not on the date of injury. See, we disagree. You'll have time on reply. I've let you run over, and you'll have time on reply. Thank you. May it please the Court, Mr. Mueller. I represent Donald Stewart. My name's Bruce Ossor. It's good to go second. The arbitrator awarded wage differential benefits to the petitioner, and a unanimous panel of the Commission affirmed it. The respondent admitted that the only issue before the Court are manifest weight questions, which puts the greatest burden on the respondent. And Monterey has not raised an issue on which the Commission did not have evidence in the record to support his decision. Can you, in the course of your argument, answer his overarching question? He says that the evidence in this case, primarily coming to him by way of the claimant's testimony, is insufficient to support a wage differential award. So how do you respond to that argument? Well, he has asthma. He has co-worker's pneumoconiosis. He can no longer work as a coal miner. There's testimony in the record from Dr. Paul that said it was only a matter of time before he was going to have to give up, that he's not a guy that likes to throw in the towel. He likes to work. The petitioner testified, I had to quit. My lungs were shot. The Commission believed him. I'm in a position now to say the Commission believed him, and that is why he's no longer working as a coal miner. The result is pneumoconiosis and asthma. But his argument is he didn't go out and do the traditional job search. There was no expert to support him in what he could earn. So it's primarily resting on his claimant's testimony. So how do you respond to that, it's not sufficient? This man worked 30 years as a coal miner. He was very active in coal mining. The record shows that he was on the Safety Committee for a number of years. He was a union president for a number of years. This was his life. He was on the State Mining Board, a board of only six people, which not only gave him his $12,000-something per year salary, but also much better health insurance benefits that he could get as a coal miner or anywhere else, a significant amount there. He also continued his local president job. Now, the fact that he had them before makes no difference to the fact that that's what he had after and that it was appropriate and it's what he could do. He doesn't have to go out and do a job search beyond that under the law? Not if he's already got one. Well, I mean, the only thing he says he doesn't have to do a job search is if he doesn't have one. That's my point. Well, and he testified, this is all I can do. Yes, yes. So, I mean, it wasn't just this is what was there. He actually testified, this is what I'm earning, what I'm doing, and that's all I can do. And I'm put in the position now, which I'm happy for, that he did say those things and the commission could have not believed him, but they did believe him. I also agree that following one step further in that argument about the wage differential, it's what he would have earned at the time of arbitration. That's not even an argument. It's exactly what the act says. So, I mean, that's a non-issue. I'm happy to go beyond. It's what he would be able to earn at the time of arbitration, the full performance of the duties that he had in his occupation when he was injured, as compared to what he is capable of earning at that time. But the question that I have relates to, it appears as if the commission intended that this man would routinely work 40 hours a week. In calculating the amount that he would be working in full performance of his duties, they used a 40-hour work week. This guy didn't work 40 hours a week very often. I think he only worked 40 hours a week four years out of their, or four weeks out of their numbers. Out of the 52-week period. I'm not aware of where that is in the record. I'm not aware there's a part-time coal miner. He was on restrictions for a back injury at the end. Yeah, that was going to be my question. Wasn't there evidence in the record that he had a back injury during the last year he worked and he missed a lot of work because of that? Yes, he had that coexisting back injury, which the commission knew of, and which caused him in that year to lose it. But there's no such thing as a less than 40-hour coal miner. In fact, when you determine by the national bituminous wage agreement what his wages would be as of the time of arbitration, the problem for the miners is normally a miner works more than 40 hours. What is the contract, 37 hours straight time, or what is it now? What the national bituminous wage agreement does is it says for each classification what your job would be, and it goes 2011, 12, 13, 14, and it covered the time of arbitration, and it gave a single per hour wage. Now, that was calculated on a 40-hour week, which is minimum because the truth is, like I said, many of these coal miners will work six-day weeks, and there's no way to calculate that in. I worked in a coal mine. It was 37 hours straight time, and then every day you got that differential at time and a half, the rest of the 40 hours. Okay. I depend. Maybe the contracts have changed, but... You were better off then. Of course you were. Don't look at him now. Here he is. I should have stayed. Yeah, but he couldn't work full-time as a coal miner now. Couldn't find a job now. Well, so that's how he gets to there. There's no requirement that he have that job search. There's no requirement that he have a vocational expert when the commission finds sufficient, his evidence. I have a question that's hypothetical because we have what the gentleman did was he went with the state, and you did say that it's better retirement, it's better medical than state than he had under the NWA contract, okay, with the company. But under the Act, it's wage differential. Hypothetically, if he were to take a lower-wage job because the benefits offset the lower wage, is that fair to the respondent employer? I don't think that's what happened. I think he took the best job he thought he could get, and as it turns out, it's even better than that. And because of those benefits, the commission said, why should he look for it? Okay. I think what I'm trying to make, the argument, is that the collateral benefits of the position should be irrelevant. Yes. Okay. Yes. Only as to why you would take that job and not in calculating what he would make. Right. Okay. Yes. You've managed to take me pretty much through my arguments here. There may be a couple others. He talked about preexisting asthma in his brief, and I don't know if he did that today. I think he did. Preexisting asthma that's made worse by the coal mine is compensable, and in this case, the records show, the testimony of Dr. Paul and Dr. Billeter show, that when he entered the coal mine, he had a mild asthma. He was taking one medication called Tylate, and Dr. Paul said that's a mild type of old-fashioned medication. The petitioner testified that his attacks were getting more frequent, more severe, and Dr. Paul, by the end of his treatment here, when he left the mine, had him on albuterol, Advair, IV antibiotics, diophilin, steroids, and nebulizer treatments, with a requirement that he go to Dr. Paul's office for treatments occasionally, and even Dr. Tudor agreed that that was very aggressive treatment and recognized that he did have to go to Dr. Paul's office for it. Those are the things that indicate that he had that worsening of his asthma. There's a case of Dawson that's cited by a respondent, and I want to address that. Dawson can easily be distinguished from this on two levels. First, Dawson was a pneumoconiosis-only case. Second, he didn't file his application until about four and a half years after he left the mine. He didn't know he had it when he left the mine. No doctor told him to quit because of it. He had no limitations. No doctor said he had limitations. All those things differentiate from this case. But the biggest thing that differentiates it is in Dawson, it was the petitioner coming here holding a 10% award and wanting a wage differential and not proving that the commission's decision was against the manifest way of the evidence. In this case, it's the respondent coming here, and he has the greater burden. So for those reasons, Dawson is easily distinguished from this case. Can you help me out with something? The employer introduced wage statements. This man only worked 40 hours a week, four weeks out of the last 52 weeks. How do we know why he didn't work up to 40 hours a week? Is there something in the record that tells us that? We know he's got a bad back. Does that mean necessarily that he didn't work 40 hours because he had a bad back? I think that maybe there are some things that the respondent could have developed further in the testimony that may have been helpful to them. No, no, no. What burden is it to prove it? Well, the proof is that he had a bad back. He worked steadily, and then he had a bad back, was put on light duty. That's all in the record. He testified about it. The commission looked at it, and they made their decision. So with the exception of Justice Holdren explaining to me a 37-hour week could be better than a 40-hour week, I wasn't aware of that. But they listened to all the testimony, and they believed it. They believed that he had to quit because his lungs were shot. No, no, I know he had to quit. And I'm not having trouble with his entitlement to wage differential. My difficulty is the calculation of the wage differential as against 40 hours a week times 26, whatever it is, per hour. It's the 40 that bothers me right now. Where did it come from? Other than he had a bad back, in other words, did he testify that the reason he only had four weeks where he worked 40 hours was because of the back, or are you asking us to connect the dots and fill in the gap, which we can't do? Well, there was testimony about that. It was discussed, and it was raised at the commission also when they made their decision. That's not on the record. I mean, you know, there's no transcript of that that I can show you. But I can tell you it was discussed then, and they made their decision. But you can't point us to any specific evidence or testimony that definitively says that's the reason he was off, the bad back, right? I think that is in there. I think that is in the testimony at the trial, that he had a bad back, he was on life duty, and that would have interfered with his work schedule. Mr. Soar, let me ask you this question. The statute provides that a wage differential is based on, and I quote, what he would be able to earn at the time of the hearing if he were able to fully perform the duties of the occupation in which he was employed at the time of the accident, close quote. Why couldn't the commission find that if he was fully able to perform the duties of the job that he was working at that time, that would be a 40-hour work week? Because it depends on what it says in the national contract. Can I ask Mr. Soar to answer first? Doesn't it rely on the contract? I think they can. I think that's their job to do. And I think they did it in concert with looking at the bituminous wage agreement and seeing what a union minor in that classification would make. So if they had to make those assumptions, that's their job, and they did it. Is there anything in the contract that says a minor's wages are usually for a 40-hour week or usually works a 40-hour week, or does it just set an hourly rate? I guess right now I'm going to say something that doesn't sound as strong as I'd like it to be, but there's an assumption that minors work 40 hours a week because with all the minors the commission sees, many, most of them are working more than a 40-hour week. And in the testimony, and I can't tell you exactly what the testimony was, but there was a lot of talk about the light duty and the back injury because the respondent wanted to make a big deal out of it. Is a copy of the contract in the record? Is a copy of the contract where? In the record. Should have been offered as an exhibit, and if not, at least the man was shown it and testified to it. That is in there, and I think it was in exhibit two. All right. Let's see if there's anything else. I think that unless you can think of something, thank you very much. I ask that the wage differential be affirmed. Thank you, counsel. Counsel, you may reply. Thank you. Thank you. The evidence in the record is that this guy had his back injury, which caused him to be on restricted duty in March of 2006. He last worked in September of 2006. Therefore, the wage statement is for, let's say, six months prior to the back injury that caused him to be off work. He still only worked, as indicated, 40 hours in four weeks out of the 52 weeks, and as I argued in my brief, that suggests that the 40 hours times the $26 figure is wrong. But as Justice Stewart read you, it's two-thirds of the differential between the average amount that he would be able to earn in the full performance of his duties in the occupation in which he was engaged at the time of the accident. Now, the occupation was coal mining, and full performance of his duties, that's what we're trying to figure out here. Is it 40 hours a week? What is full performance of his duties? Well, I think all that's in the record is what you have. I can tell you all the things, but it's not in the record, so I'm sorry. If the contract's in the record and the contract establishes that full performance is 40 hours a week, I guess it's 40 hours a week. Is it in the record? We do not have in the record the contract that he was working under at the time he last worked as a coal miner. That is not there. Well, at the time of the hearing. What about the time of the hearing? I'm sorry. I didn't hear either one of you. The time of the hearing. Is the contract at the time of the hearing in the record? All that's in the record at the time of the hearing was the sheet that showed the 26.415 or whatever per hour. There's no contract in the record at all? Not that I saw. That's the same question. But my point is the proof of what he was doing at the time he last worked for Monterey Coal or in the last year he worked for Monterey Coal is in the wage statement and proves that he was not working 40 hours a week. It was their burden to prove what he was earning and how much he was working and why and if he would have been working 40 hours, 37 and a half, 36 and a quarter, whatever, at the time that the wage differential is awarded. Or they haven't met their burden and the wage differential should be thrown out. Now, the other point I wanted to make. He left the labor market. He retired. And that makes it, in my opinion, impossible to determine how much he might have earned in a replacement job for the coal mine job he quit because we don't have the evidence as we've discussed plenty before. So, obviously, I would like the court to overturn the wage differential, send it back to the commission to enter an order giving him some benefits under Section 8D2 of the Act. Thank you very much. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement and a written disposition shall issue. The court will take a brief reset.